IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff              )
                                   )
        -VS-                       ) Criminal No. 10-10366-PBS
                                   ) Pages 1 - 26
YEUDY VIZCAINO,                    )
                                   )
            Defendant              )


SENTENCING


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    EMILY O. CUMMINGS, ESQ., Assistant United States Attorney,
Office of the United States Attorney, 1 Courthouse Way, Boston,
Massachusetts, 02210, for the Plaintiff.

    JAMES H. BUDREAU, ESQ., Law Office of James Budreau,
20 Park Plaza, Suite 1405, Boston, Massachusetts, 02116,
for the Defendant.

ALSO PRESENT:  Susan Walls, U.S. Probation Office.


                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts  02210
                        September 8, 2011, 2:35 p.m.


            LEE A. MARZILLI
        OFFICIAL COURT REPORTER
      United States District Court
      1 Courthouse Way, Room 7200
          Boston, MA  02210
          (617)345-6787

 1                 P R O C E E D I N G S

 2          THE CLERK:  Court calls Criminal No. 10-10366, United

 3   States v. Vizcaino.  Could counsel please identify themselves

 4   for the record.

 5          MS. CUMMINGS:  Good afternoon, your Honor.  Emily

 6   Cummings on behalf of the United States.

 7          THE COURT:  Yes, thank you.

 8          MR. BUDREAU:  And, your Honor, James Budreau on behalf

 9   of Mr. Vizcaino.  Good afternoon.

10          MS. WALLS:  Susan Walls on behalf of Probation.

11          THE COURT:  Thank you.  I understand you're not well?

12          MR. BUDREAU:  I'm not well, but I'm functional, so --

13          THE COURT:  You have back problems?

14          MR. BUDREAU:  Yes.  I ruptured a disk, so --

15          THE COURT:  Is it better to stand or to sit?

16          MR. BUDREAU:  It doesn't matter at the moment.

17          THE COURT:  Well, whatever is better is fine with me,

18   all right?

19          So we have one objection to the United States

20   Sentencing Guidelines, which I'm not sure makes a difference.

21          MR. BUDREAU:  I don't think it makes a difference,

22   your Honor.  I do it just to preserve the issue as much as I

23   have to do it.

24          THE COURT:  Okay, so at this point I'm not ruling on

25   it because I don't need to, so if you end up doing what so many

1   defense attorneys do in state court, then it's preserved, and I

2   will address it if I ever need to.

3          MR. BUDREAU:  Thank you, your Honor.

4          THE COURT:  So that having been said, as I understand

5   it, there are no other objections?

6          MR. BUDREAU:  There are none.

7          THE COURT:  Have you had a chance to review the full

8   report with your client?

9          MR. BUDREAU:  Yes, I have, your Honor.

10         THE COURT:  Okay.  So at this point I am going to

11   adopt the Presentence Report in particular and impose -- and

12   sort of obviously calculate the advisory Guideline range, which

13   is extremely high because of the nature of the prior record and

14   the mandatory minimum involved, but, in any event, it's 34 and

15   6, 262 to 327 months, eight years supervised release, $17,800

16   to $10 million, and a $100 special assessment.  Does anyone

17   have an objection to the advisory range?

18         MR. BUDREAU:  Not a legal objection, your Honor.

19         MS. CUMMINGS:  No, your Honor.

20         THE COURT:  Okay, I understand.

21         MS. WALLS:  Your Honor, it's $100 per count, and there

22   are four counts.

23         THE COURT:  Oh, I got that wrong.  So $400 special

24   assessment.  Thank you.

25         Okay, so, now, I read somewhere that the government

1    had agreed to a variance.

2         MS. CUMMINGS:  Your Honor, that's correct.  At the

3    Rule 11 hearing the government stated the Guideline range as

4    188 to 235 months, and because we did state that, we do stand

5    by that as our range that we're recommending, specifically the

6    188 months.  If I could --

7         THE COURT:  Yes, yes, why don't you address, and then

8    I'll hear from Mr. Budreau, sitting or standing, and then of

9    course from his client who has a right to allocute.  So go

10   ahead.

11        MS. CUMMINGS:  This is actually a side issue that your

12   Honor asked the government to address back in May.  It's

13   Document 29 in the docket, and it's as to whether or not

14   Mr. Vizcaino had to affirm the 851 predicate conviction.  And

15   it appears to be, and it's the government's position, that he

16   does in fact have to affirm the 851 prior conviction prior to

17   sentencing being imposed, which I don't believe he did in May,

18   but I know there were subsequent hearings, so I don't know if

19   that actually took place.

20        THE COURT:  Oh, I remember this.  We kept going back

21   and forth on it.  What's the prior conviction you want him to

22   confirm?

23        MS. CUMMINGS:  The prior conviction was a November 24,

24   2004 conviction out of Lynn District Court to possession with

25   intent to distribute Class D, which is marijuana, and the

1   docket number was 04-13-CR-005781.

2          THE COURT:  What did he get?

3          MS. CUMMINGS:  I don't have it listed on the

4   information, your Honor.

5          (Pause.)

6          MS. CUMMINGS:  It was a three-month committed

7   sentence, your Honor.

8          THE COURT:  This is an unusual case in that the

9   criminal history points are so high -- they're at 36 -- and yet

10  he actually hadn't done that much time in state court, and I'm

11  wondering, since I get so few 851s, why did the government

12  choose this?

13         MS. CUMMINGS:  Your Honor, I think, and if the Court

14  will allow me sort of to --

15         THE COURT:  Were you in at the get-go, or did you

16  inherit this from somebody?

17         MS. CUMMINGS:  I was, your Honor.

18         THE COURT:  Okay.

19         MS. CUMMINGS:  And, again, if I could sort of draw

20  from my state practice experience, Mr. Vizcaino appears to have

21  a record indicative of somebody with a history of substance

22  abuse.  I think, despite his denials of any problems, he also

23  admits to what could be construed as alcohol abuse, marijuana

24  abuse, and heroin abuse.  Frequently in the state court system,

25  given the volume of cases -- the record that Mr. Vizcaino has

1   is somebody who's stealing to support a habit -- so frequently

2   the state courts, at least from my own personal experience, and

3   perhaps Mr. Budreau has had the same experience, will attempt

4   sort of a treatment regimen in the hopes that somebody in

5   Mr. Vizcaino's situation will learn from his experience.

6           THE COURT:  Well, did that happen here?

7           MS. CUMMINGS:  It doesn't appear so.

8           THE COURT:  Well, so don't put it in the record.  So

9   he's an addict who's gone untreated.

10          MS. CUMMINGS:  Well, the Court inquired as to why the

11  851 was filed.

12          THE COURT:  Yes, just it was --

13          MS. CUMMINGS:  That's part of the reason why.

14          THE COURT:  It was harsh to file it.  Actually, I get

15  so few 851s filed, and it's usually somebody who has more of a

16  history of violence.

17          MS. CUMMINGS:  Well, Mr. Vizcaino does have a history

18  of gang affiliation.

19          THE COURT:  Is that the reason why?

20          MS. CUMMINGS:  That's part of the reason.  And then

21  the other reason is, Mr. Vizcaino openly admitted that he was

22  selling heroin that was causing overdoses.  I don't find it to

23  be harsh to file an 851 on somebody who's --

24          THE COURT:  Just I want to know because it's rare

25  here.

 1          MS. CUMMINGS:  Well, that's the reason:  He's selling

 2   something that's causing people to overdose and potentially

 3   fatalities, and there were fatalities all over Lynn.

 4          THE COURT:  Were these fatalities from his stuff?

 5          MS. CUMMINGS:  Some of them were believed to be,

 6   though it hasn't been proven, attributable to the heroin that

 7   Mr. Vizcaino, and particularly his supplier, were selling.  So

 8   those were the reasons that went into the filing of the 851.

 9          THE COURT:  All right, well, that's worth hearing.  So

10   what gang do you think he's affiliated with?

11          MS. CUMMINGS:  He admitted to being affiliated with

12   the Latin Kings.  He has gang tattoos, and he also sort of

13   talked openly about it.

14          THE COURT:  Did you file a sentencing memo?

15          MS. CUMMINGS:  I did not, your Honor.

16          THE COURT:  And the other is because you have, at

17   least in your view, cause to believe that some of the heroin

18   being sold by the supplier, maybe through him, caused people to

19   overdose in Lynn?

20          MS. CUMMINGS:  That is part of it, and it's on

21   videotape, as admitted by Mr. Vizcaino, as he's cautioning the

22   cooperating witness, when he sells this to his supposed

23   customers, to be careful because it's causing people to

24   overdose.  And that adds a very serious element to the case in

25   which also, in conjunction with everything else, led to the

e73a4288-737c-40ec-be68-c57b452ea427

1   filing of the 851.

2          THE COURT:  All right, and so you're recommending a

3   188?  Is there a reason how you got to 188?

4          MS. CUMMINGS:  The 188 was based on my calculations of

5   the Guidelines prior to the 851 being filed.  I also believe --

6          THE COURT:  Oh, oh, oh, so you're trying to temporize.

7   No?

8          MS. CUMMINGS:  Your Honor, I don't know that this is

9   somebody who needs to be sent for 262 months to --

10          THE COURT:  So it's your view of "sufficient but not

11   greater than necessary"?

12          MS. CUMMINGS:  Yes.

13          THE COURT:  This is the government's take on the

14   parsimony clause?

15          MS. CUMMINGS:  It is, your Honor.  I think it's a

16   significant sentence.  It's the hopes of the government that

17   Mr. Vizcaino will finally clean up his act and will

18   sufficiently be punished for what it was that he was doing.

19   Possibly he will seek treatment, possibly he'll get treatment

20   and he'll make different decisions when he's finally released,

21   but 188 months seems sufficient to punish Mr. Vizcaino for what

22   he's been charged with.  It takes into account his history, but

23   it's also not the 262 months that it could be, so essentially --

24          THE COURT:  So you got it how, you calculated the

25   Guidelines without the 851?

1        MS. CUMMINGS:  Correct, your Honor.

2        THE COURT:  So you put it in and took it out again

3   essentially?

4        MS. CUMMINGS:  More or less, your Honor.

5        THE COURT:  All right, all right.

6        MS. CUMMINGS:  And really the 851 was for the

7   basement, not the ceiling.

8        THE COURT:  Thank you very much.

9        MR. BUDREAU:  Your Honor, I'll address the selling of

10  drugs, so to speak, since it really hasn't been a focus in this

11  case at all.  I think that may have been one of the reasons why

12  they filed the 851.  However, I don't think there's been

13  sufficient evidence presented since that any of the drugs that

14  he had were actually hot.  I think that in that area, there

15  were some problems with drugs in the Lynn area at the time.

16  There's no evidence it was connected to him or to his source of

17  drugs at the time.  He was talking about his knowledge of the

18  fact that there were hot drugs out there.

19       THE COURT:  What paragraph are we talking about?

20       MR. BUDREAU:  I don't even know that it's included in

21  here, your Honor.

22       THE COURT:  Is it?

23       MR. BUDREAU:  I don't think it's -- I think it's --

24  I'm just referring to her allegations.  I think the evidence

25  was so insufficient that it didn't rise to the level of

1    preponderance of the evidence.

2              THE COURT:  Is it Paragraph 47 you're referring to?

3              MR. BUDREAU:  It might be.

4              THE COURT:  "In fact, Vizcaino told the CW that the

5    heroin was so good it could almost kill someone," is that what

6    you're referring to there?

7              MS. CUMMINGS:  Yes, your Honor.

8              MR. BUDREAU:  So, I mean, there's maybe some evidence

9    that he knew that in Lynn that some people were injured by

10   heroin.  My understanding, and, frankly, in conversations with

11   my client, is that, you know, that sort of thing is not unusual

12   in the heroin world; people like to know it's good stuff.  So

13   it's puffing.  It would be puffing.  If indeed it was anything,

14   it was puffing.  There's no evidence that he knew that the

15   stuff was connected or that it was connected to bad drugs in

16   the area.

17             Mr. Vizcaino was a drug addict.  Despite his

18   declinations of that, he has a history of drug use, of drug

19   abuse.  That's what led him into the selling of heroin.  He was

20   using at the time.  He went through severe withdrawal when he

21   came into prison.  He clearly has a problem.  There's no

22   question of that.

23             In terms of a sentence that would reflect that which

24   is necessary to protect the public, and in order to be

25   sufficiently harsh for Mr. Vizcaino, I did recommend 120 months,

1   your Honor.  That's the minimum mandatory.  I think that's

2   sufficient for a number of reasons as I explained in my

3   memorandum.  His criminal history, while long, is of a petty

4   nature.  I mean, it's clear that this guy is involved in drugs,

5   the type of stuff he's doing, stealing cars, you know, stealing

6   things out of cars.  There's some B&Es, but it's mostly, you

7   know, attaching plates.  In fact, I counted up all the points

8   relative to car offenses, and half of his points are relegated

9   to car offenses.  So they're not of a serious nature.

10      There are a couple involved with resisting arrest.

11  There's one involved with assault and battery on a girlfriend,

12  which is pushing her.  Based upon what the complaint says, it

13  was not violent in the sense of punching someone or hurting

14  someone, and in fact I don't think there's any evidence that

15  he's been involved in any sort of violent attacks.

16      So I think this is a person who has a history, a long

17  repetitive history of coming through the state system,

18  supporting his drug habit through stealing things, and, as a

19  result, accumulating a lot of criminal history points.  He

20  hasn't served a lot of time.  I think two years in the house of

21  correction was the longest that he served.  He's done no state

22  time, and I think that a sentence of 120 months is a

23  significant, a serious jump for him in terms of time served.

24  It would satisfy every element of the Guidelines.  In fact, I

25  think it is harsher than is necessary, but because it's a

1    minimum mandatory, it's the minimum the Court could impose.

2    But I think it would in that context, understanding that it's

3    harsher than necessary, it still would address all the concerns

4    that the Court, the public, and the Sentencing Commission have

5    about someone like him.  It would give him the opportunity to

6    get the type of vocational skills that he clearly doesn't have.

7    It would give him the opportunity to reflect upon his conduct

8    and what the repetitive nature of his conduct will result in in

9    the future.  It will give him the opportunity to get healthcare

10   treatment, which he clearly needs.  There's an episode, in

11   fact, in his health --

12          THE COURT:  Has he had health -- you know, your sister

13   was sort of speculating that he maybe never got it.

14          MR. BUDREAU:  He never really got any treatment.  I

15   think there's one opportunity where he got some drug treatment

16   in jail.  And he also, there's an episode back in 2006, 2008,

17   his mother passed away, and he tells me that he had

18   hallucinations, auditory hallucinations at that point; and he

19   actually got treatment, and it's in the records, for that for a

20   short period of time.  He says that after he got out of jail,

21   he no longer had those problems.  Now, that might be because he

22   was self-medicating with drugs at the time, but he tells me

23   that he never had them before his mother passing away and he

24   hasn't had them since, but he had them during that short period

25   of time when he was in jail.  His mother passed away, he didn't

1   have her available to him, and he had hallucinations, and he

2   was treated for that.  So whether or not there's something

3   going on in the background, I'm not sure, your Honor, but I'm

4   sure that during the period of time that he is incarcerated, he

5   will get the opportunity to have that sort of evaluation done

6   and that sort of treatment done, if indeed it's necessary.

7           I think that the ten years is something that will send

8   a message to the community, his peers, it sends a message to

9   him that this sort of conduct is not going to be condoned by

10  the Federal Court or by any courts.  But I do think a jump from

11  two years to even ten years is so significant that it does fall

12  into the realm of harsh, your Honor, and I don't think anything

13  more is necessary.  Why add five more years on?  Why add three

14  more years on?  It doesn't make any sense.  There's no

15  measurement for that to have a rational basis to add onto 120

16  months.  120 months is enough.  And I think that the eight

17  years supervised release is even more important here, even more

18  critical, because it does give both the federal government, the

19  public, as well as Mr. Vizcaino an opportunity for him to be

20  supervised when he's released, for drug treatment --

21          THE COURT:  How old is he?

22          MR. BUDREAU:  He's thirty-four years old.  When he

23  gets out on a ten-year sentence, he's going to be early

24  forties.  If he has a fifteen-year sentence, he's into his

25  upper forties.  And one of the biggest problems someone like

1   him has with the criminal history is that it's hard to get

2   employed.  Can you imagine in his upper forties what it's going

3   to be like?  In his early forties, he's in a better place, he's

4   in a much better place than if he's in his upper forties.  You

5   know, I'm fifty, and I understand the impact of age on

6   employment, but I think with someone like himself, you know,

7   both physically and --

8           THE COURT:  Has he ever really worked?

9           MR. BUDREAU:  He's done some work, you know, but not a

10   whole lot of work, your Honor.

11           THE COURT:  I have that somewhere in here.

12           MR. BUDREAU:  I don't think there's anything that

13   could --

14           THE COURT:  No.

15           MR. BUDREAU:  -- any measurement of work.  I think

16   he's getting by.  I think he's relying on his -- he was relying

17   on his mother for a long period of time.  I do think -- he

18   doesn't have any of the skills.  I don't remember --

19           (Discussion between Mr. Budreau and the defendant.)

20           MR. BUDREAU:  He's not a high school grad.  It gives

21   him an opportunity to get a GED, and all the things that he

22   hasn't done, focus it -- you know, he's got seven, eight

23   more -- well, actually he'll have almost eight and a half years

24   because at a ten-year sentence, my understanding is, even if

25   the Court ran it concurrent with his state time that he's --

1        THE COURT:  I was going to ask you about that.  When

2   is the state time about to run?

3        MR. BUDREAU:  That will be out in October?  When's

4   your state time going to run?

5        (Discussion between Mr. Budreau and the defendant.)

6        THE COURT:  Do you know?

7        MS. WALLS:  Your Honor, I called to ask about it, and

8   I don't have the notes handy, but it was sometime in 2012.

9        THE COURT:  So it could be a full other year?

10       MR. BUDREAU:  A full more year, your Honor.  So I

11  certainly would ask that it's concurrent for that period of

12  time, but I don't know that the Court can go back, and even

13  though it's --

14       THE COURT:  Well, I wouldn't anyway, but I would be

15  receptive to running it concurrently.  What was the state

16  sentence for?  Is it another distribution?

17       MR. BUDREAU:  It was the same case.  It's a related

18  case, your Honor.  It was the same drugs.

19       THE COURT:  Well, we're not double counting, right?

20  The drugs in the state case we're not including here, are we?

21       MR. BUDREAU:  No, but it is related conduct.  It's

22  within the same conspiracy in the sense that it happened all at

23  the same time.  He was arrested in the state case before he was

24  arrested in this case, but all the conduct in this case

25  occurred before the state case.

1    THE COURT:  Right, but the amount of drugs, was it

2    included?

3    MS. WALLS:  Your Honor, the amount of drugs, number

4    one, we didn't have drug certs, so we did an estimate; and,

5    number two, it didn't change the range because based upon our

6    conservative estimates, it would have not been more than --

7    THE COURT:  If it's all a course of conduct, it would

8    make sense to run it concurrently.

9    MS. WALLS:  It was basically a continuation of the

10   federal case, the state case.

11   MR. BUDREAU:  But my point is, he's going to serve

12   extra time on the state end.  He already --

13   THE COURT:  No, he won't.  I'll run it concurrent.

14   MR. BUDREAU:  Right.  What?

15   THE COURT:  I'll run it concurrently.

16   MR. BUDREAU:  Yeah, but backwards, you can't run

17   concurrent backwards, so --

18   THE COURT:  Oh, I see.

19   MR. BUDREAU:  So I guess my point is, your Honor, that

20   ultimately a ten-year sentence will serve the purpose of the

21   Guidelines and 3553(a).

22   My client, frankly, I've spoken to him at length about

23   allocuting.  He doesn't feel like he has the necessary skills

24   to do that, your Honor.  When I say "skills," just being able

25   to stand up and speak, he's just too nervous about it.

1       THE COURT:  Mr. Vizcaino, do you want to say anything?
2   Is that "no"?  You're shaking your head "no"?
3       MR. BUDREAU:  You have to reply "yes" or "no."
4       THE DEFENDANT:  No, ma'am.
5       MR. BUDREAU:  And that's not out of --
6       THE COURT:  Well, can I ask you a question.  You don't
7   have to answer if you don't want, but there's going to be a
8   serious prison sentence.  That's the bad news.  The good news
9   is, when you get out there are services -- why don't you stand
10  up for a minute -- there are services the court can provide.
11  You've got problems.  You know, you're selling heroin, a nasty
12  drug, but you're also an addict, is that right?
13      THE DEFENDANT:  Yes, ma'am.
14      THE COURT:  So would you want to do something like the
15  drug court when you get out?
16      THE DEFENDANT:  If it's in place.
17      THE COURT:  If what?
18      Have you talked to him about that?
19      MR. BUDREAU:  I have talked to him, your Honor, about
20  the drug program, not drug court.  I don't know that I'm
21  familiar with the drug court.
22      THE COURT:  You know, Judge Sorokin's thing.  I
23  shouldn't call it that, but, you know, the Restart Program,
24  CARE or Restart.
25      MR. BUDREAU:  I haven't had any clients go into that

1   program, your Honor, so --

2           THE COURT:  Really?

3           MR. BUDREAU:  -- I'm just not familiar with it.

4           THE COURT:  I think he has to request it.

5           MR. BUDREAU:  That's a post-sentence event?

6           THE COURT:  Yes, yes.

7           MS. WALLS:  Care actually is the drug court, and it's

8   a voluntary program that he would need to -- it can only be

9   imposed as a recommendation, you recommend that he participate

10  in it, but ultimately he has to agree to it.

11          THE COURT:  Well, I'm going to make that

12  recommendation, and you'll have to agree and you need to think

13  about it, but let me tell you about it because you are the

14  classic guy I'd like to have in it because you have 36 criminal

15  history points, and to get into the highest category, you only

16  need 13.  I mean, that's huge.  You don't often see a record

17  this extensive.

18          Now, as your lawyer points out, you haven't ever done

19  much time, but the drug program is a structure for you of a

20  judge who cares about you and will see you periodically.  Is it

21  every week?  Is that when they come in?  But if you take drugs,

22  you could get revoked overnight.  On the other hand, if you are

23  consistent with the program, and it's very structured, you can

24  get time off your supervised release.  So it's something I want

25  you to think about.  You're exactly the kind of person I had in

1    mind.  And you don't have to make a decision now.  Is that

2    right?

3          MS. WALLS:  No, your Honor.  He would make the

4    decision when he comes out.  And there's also a question of

5    eligibility because I know that there is an indication that he

6    was using heroin during the couple of months immediately prior

7    to his arrest, but his primary drug that he's been using for

8    years and years is marijuana, and generally people with

9    marijuana problems aren't considered to be appropriate for

10   CARE.  They're more referred to Restart because the nature of

11   the addiction is --

12         THE COURT:  All right, so Restart means essentially,

13   if they don't view you by the time you get out as having an

14   addiction problem on a drug that they work the hardest with,

15   they may put you into another one, which is really just a

16   reentry court but a similar kind of concept of the structure of

17   a judge watching over you.  Do you feel as if you need drug

18   treatment?

19         THE DEFENDANT:  (Nodding affirmatively.)

20         THE COURT:  You can tell me.

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  You do?  So would you like me to recommend

23   the RDAP program in federal prison, the program for drug

24   offenders?

25         THE DEFENDANT:  Yes, ma'am.

1        THE COURT:  What do you want to do when you get out?

2   What kind of vocation do you want?  You've got to work.  Don't

3   keep looking at him.  He doesn't know what you want to do.  How

4   far did you go in school?

5        THE DEFENDANT:  Eighth grade.

6        THE COURT:  Can you read?

7        THE DEFENDANT:  Yeah.

8        THE COURT:  Okay, do you need a GED?

9        THE DEFENDANT:  Yes.

10       THE COURT:  So maybe a requirement that he pursue a

11  GED.  But try and get that in prison as well.  You have a lot

12  of time, try and get your GED, and then maybe try and provide

13  some vocational training and basic skills when you get out

14  because you can't earn your living selling heroin.  That's

15  obvious now, I hope.

16       MR. BUDREAU:  And, your Honor, if I may, just my

17  experience over the last four or five months with Mr. Vizcaino,

18  one thing he said to me is that he can't stand being in

19  Middleton because there's nothing to do.  And he doesn't

20  meaning playing basketball.  He means in terms of bettering

21  himself.  He really is -- he's voiced that to me a number of

22  times and not in the context of sentencing.

23       THE COURT:  Right.  I mean, the bad news is, you have

24  this incredibly rough sentencing scheme in Federal Court

25  because you're now such a recidivist, you end up here, and

1    that's not good news for you.  But when you get out, the good

2    news is, we actually have money, unlike the state system, to

3    give you things like drug treatment.

4           So, all right, thank you.  This is what I'm going to

5    do:  I'm going to impose a sentence of 144 months, which is

6    below what the government requested and above what your

7    attorney requested.  And let me start with the nature of the

8    offense.  Heroin is a nasty drug.  I often wonder why the same

9    stigma doesn't attach to heroin as like crack or something

10   because I think that heroin is a horribly addictive drug and it

11   kills, and it's particularly serious in the Lynn area, and you

12   sold on multiple occasions, and it's part of a repetitive

13   conduct in terms of a general pattern of criminal misconduct,

14   reflective, as your attorney says, of an addict.  So you've

15   been in the system.  It's illegal.  It's killing people, maybe

16   not your drugs -- I don't know that -- and it's a big problem.

17   It's a plague for the Lynn area.  And so I'm doing that both

18   because of the nature of the offense of selling so much heroin

19   but also because of the fact that it is a particular problem in

20   the Lynn area, and it's important to deter you from doing it

21   again and also to deter others in the neighborhood by saying,

22   you know, "You get in big trouble if you do this."

23          Second, in terms of your personal characteristics, you

24   know, the thing that stands out the most to me is actually the

25   lengthy criminal record, and, in addition, I notice you haven't

1    really worked much.  We just had that discussion.  And maybe

2    you were involved with gangs.  I mean, it's just a bad

3    trajectory, and so I need you to as a personal matter move out

4    of this.

5           On the other hand, I do think both sides agree that a

6    lot of this stems from a drug addiction problem.  That's part

7    of your individual -- I don't know why marijuana is drummed

8    out, but, in any event, it sounds like you do -- I forget, I

9    read it -- quite a bit of marijuana, and my guess is that

10   that's a serious part of your inability to work because -- I

11   think I read that somewhere.  Hold on a second.

12          MS. WALLS:  Yes, your Honor, I think he said he smokes

13   every day.

14          THE COURT:  Yes, every day quite a bit, and so I think

15   that interferes with your ability to work.  I do have it

16   somewhere here.

17          You also have a serious mental disease, as I'm

18   remembering.  Yes, there it is.  You said three blunts per day

19   since you were a teenager, and, of course, now there's the

20   heroin.  And you also have mental health, so there should be

21   mental health treatment; substance abuse treatment, inpatient

22   if necessary; a recommendation to the drug court and/or the

23   Reentry Court; I think a stay-away order from the Latin gangs.

24          Do you have any particular affiliations, people you

25   want him not to be involved with?

1          MS. CUMMINGS:  No specific people, your Honor.  I

2     believe he still has to affirm the 851, however.

3          THE COURT:  I couldn't hear a word you said.

4          MS. CUMMINGS:  No specific people, your Honor, but I

5     believe he still has to affirm on the record the 851 prior

6     conviction.

7          THE COURT:  Yes.  By the way, do you affirm the 851

8     conviction, that conviction she talked about that you got the

9     distribution?

10         MR. BUDREAU:  That is the one that we're attacking,

11    your Honor.  As it stands now, it is a conviction, it is

12    something he was convicted for, yes.

13         THE COURT:  All right, do you agree with that?

14         THE DEFENDANT:  Yes, ma'am.

15         THE COURT:  Okay.  So that's the one that was the

16    distribution out of?

17         MS. CUMMINGS:  Lynn, your Honor.

18         THE COURT:  Lynn.  So basically eight years of

19    supervised release, no fine, and the $400 special assessment.

20         Let me also say that you have lots of -- are you the

21    one?  I've done so many sentencings.  You have children, right,

22    from different wives?  How many child support orders do you

23    have?

24         THE DEFENDANT:  Two.

25         THE COURT:  Two.  So I order that you get employment

1  and that you, to the extent feasible, pay your child support.

2  Now, I don't know how old the kids are.  That may be moot by

3  the time you get out.  How old are your children?

4       THE DEFENDANT:  Ten, nine, and maybe fourteen because

5  I don't know --

6       THE COURT:  Well, this may be moot at that point, but

7  to the extent that they're still minors, to pay for child

8  support.

9       I'm going to run the sentence immediately so that

10  essentially it will run concurrently with the state court

11  sentence because I think that's appropriate.  It's relevant

12  conduct, and essentially I think it would be greater than

13  necessary to run it consecutively.

14       Is there anything else that I need to talk about here?

15  Standard conditions of release?

16       MS. WALLS:  The standard conditions, yes, the standard

17  conditions that require mandatory drug testing.

18       THE COURT:  Yes, the maximum amount of drug testing.

19  And I must say that -- I think I've started seeing this myself

20  in these presentence reports -- that while marijuana may not

21  carry the same kind of penalties in the state as it used to,

22  three blunts a day will interfere with any ability to work or

23  have a productive life.  And so I am ordering you, obviously

24  you have to comply not just with, you know, don't do heroin,

25  but also no marijuana at all.  I don't think alcoholic abuse is

1    a problem for you, right?  It's the marijuana.  That's become a

2    little bit of an uncertainty on supervised release, what to do

3    with marijuana, but at least in this situation I'll make it an

4    express condition of release to make it really certain.  So

5    there we go.

6         Anything else we need other than the notice of appeal

7    rights?

8         MS. CUMMINGS:  No, your Honor.

9         MR. BUDREAU:  No, your Honor.  Thank you.

10        THE COURT:  All right.  And I have to say one thing to

11   the government.  It is odd to sort of add in the 851 and then

12   withdraw it, but I do understand you wanted the basement for

13   it; but I was very glad, and I haven't always seen it, that you

14   didn't stick with that original sentence, which seemed way out

15   of proportion.

16        MS. CUMMINGS:  Thank you, your Honor.

17        THE CLERK:  Sir, can you please stand.  The Court

18   hereby notifies you of your right to appeal this sentence.  If

19   you cannot afford the cost of an appeal, you may move to

20   proceed in forma pauperis.  Any appeal from this sentence must

21   be filed within fourteen days of entry of judgment on the

22   docket.

23        Do you understand these rights?

24        THE DEFENDANT:  Yes, ma'am.

25        THE COURT:  Okay, thank you.

1          THE CLERK:  All rise.

2          (Adjourned, 3:08 p.m.)

3               C E R T I F I C A T E

4


5

UNITED STATES DISTRICT COURT )
6   DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON               )
7


8


9          I, Lee A. Marzilli, Official Federal Court Reporter,

10   do hereby certify that the foregoing transcript, Pages 1

11   through 26 inclusive, was recorded by me stenographically at

12   the time and place aforesaid in Criminal No. 10-10366-PBS,

13   United States of America v. Yeudy Vizcaino, and thereafter by

14   me reduced to typewriting and is a true and accurate record of

15   the proceedings.

16      In witness whereof I have hereunto set my hand this 1st

17   day of March, 2012.

18


19


20


21


22

                   /s/ Lee A. Marzilli
23         _____

                   LEE A. MARZILLI, CRR
24         OFFICIAL COURT REPORTER

25